UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA REED,

        Plaintiff,                            Hon. Ellen S. Carmody

v.

                                                Case No. 1:10-cv-350

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

## **OPINION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act. On August 6, 2010, the parties consented to proceed in this Court for all further proceedings, including an order of final judgment. 28 U.S.C. § 636(c)(1). By Order of Reference, the Honorable Gordon J. Quist referred this case to the undersigned. (Dkt. #9).

        Section 405(g) limits the Court to a review of the administrative record and provides that if the Commissioner's decision is supported by substantial evidence it shall be conclusive. The Commissioner has found that Plaintiff is not disabled within the meaning of the Act. For the reasons stated below, the Court concludes that the Commissioner's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## **PROCEDURAL POSTURE**

Plaintiff was 38 years old when her insured status expired and 41 years old at the time of the ALJ's decision. (Tr. 14, 24, 140). She completed one year of college and previously worked as a cashier, stocker, and housekeeper. (Tr. 22, 171).

Plaintiff applied for benefits on March 14, 2006, alleging that she had been disabled since May 6, 2005, due to back problems, nerve damage, lupus, fibromyalgia, depression, urticarial vasculitis, and chronic fatigue. (Tr. 137-44, 170). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 92-136). On December 2, 2008, Plaintiff appeared before ALJ William Reamon with testimony being offered by Plaintiff, Plaintiff's husband, and vocational expert, Paul Delmar. (Tr. 26-70). In a written decision dated March 4, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 12-24). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-4). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 2006. (Tr. 14). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423;

*Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

On July 13, 2005, Plaintiff was examined at the Harbor Arthritis Center. (Tr. 277). Plaintiff was diagnosed with "lupus syndrome[1] with slight eruption of urticarial vasculitis[2] secondary to sun exposure." (Tr. 277). It was further noted that Plaintiff was experiencing "chronic daily headaches associated with tension and high caffeine intake." (Tr. 277). Plaintiff was "instructed to quit smoking." (Tr. 277). Treatment notes from the Harbor Arthritis Center, dated November 9, 2005, indicate that Plaintiff was "advised must stop smoking" and "advised daily aerobic exercise." (Tr. 276).

On November 28, 2005, Plaintiff was examined by Dr. Ilene Kazmers, with the Harbor Arthritis Center. (Tr. 286). Plaintiff reported that "she is feeling well in terms of RA [rheumatoid arthritis] symptoms with only 5-10 minutes of morning stiffness." (Tr. 286). Dr. Kazmers reported that Plaintiff's rheumatoid arthritis was "stable on current treatment." (Tr. 286).

On November 29, 2005, Plaintiff participated in a "sleep evaluation" conducted by Dr. Dwayne Griffin. (Tr. 290-91). Plaintiff reported experiencing difficulty sleeping, but also reported that "she drinks large amounts of caffeine up to three liters per day up into the evening hours." (Tr. 290). The results of a physical examination were unremarkable. (Tr. 290). Plaintiff

---

[1] Lupus is a "chronic inflammatory disease that occurs when your body's immune system attacks your own tissues and organs." *Lupus*, available at http://www.mayoclinic.com/health/lupus/DS00115 (last visited on September 22, 2011). While "[t]he outlook for people with lupus was once grim. . .treatment of lupus has improved considerably. . .[and] most people with lupus can lead active lives." *Id.*

[2] Urticaria are "batches of raised, red or white itchy welts (wheals) of various sizes that appear and disappear." Chronic hives (urticaria), available at http://www.mayoclinic.com/health/chronic-hives/DS00980 (last visited on September 22, 2011). Vasculitis refers to an inflammation of the blood vessels. Vasculitis, available at http://www.mayoclinic.com/health/vasculitis/DS00513 (last visited on September 22, 2011).

was in "no acute distress" and she exhibited 5/5 strength with a "steady" gait. (Tr. 290). The doctor concluded that "caffeine excess" was contributing to Plaintiff's sleep difficulties. (Tr. 290). Plaintiff was "strongly advised to limit caffeine intake to a.m. consumption only." (Tr. 291). Plaintiff was also scheduled to participate in a sleep study. (Tr. 291). On December 20, 2005, Dr. Griffin reported that Plaintiff "cancelled her sleep study that was originally scheduled for December 5, 2005 and then later rescheduled for December 15, 2005." (Tr. 289). The doctor further noted that Plaintiff "cancelled that appointment as well and did not reschedule." (Tr. 289).

Treatment notes from the Harbor Arthritis Center, dated May 10, 2006, indicate that Plaintiff was experiencing "lupus syndrome with intermittent eruption of urticarial vasculitis." (Tr. 418). It was further noted that Plaintiff "continues to smoke." (Tr. 418). Plaintiff's medications were continued and she was "advised once again to quit smoking." (Tr. 418). X-rays of Plaintiff's chest, taken May 13, 2006, were "unremarkable." (Tr. 422).

On June 5, 2006, Plaintiff was examined by Dr. Emilio Gatti. (Tr. 351-52). Plaintiff reported that she was experiencing "numbness of the left hand" which began "about a month ago." (Tr. 351). Plaintiff reported that her "symptoms are constant" and that she feels "as if she were wearing a glove from about the wrist downwards." (Tr. 351). Plaintiff denied experiencing "other associated symptoms" such as loss of dexterity, exacerbation of her symptoms by sustained or repetitive use of her hand, muscle weakness, or sensory deficits. (Tr. 351). The results of a physical examination were unremarkable. (Tr. 351-52). Plaintiff exhibited "normal" muscle tone with no evidence of atrophy. (Tr. 352). Plaintiff exhibited 5/5 strength "in all limbs" and a sensory examination revealed "no deficit." (Tr. 352). Plaintiff was "able to ambulate on the toes, heel and

5

tandem without difficulties." (Tr. 352). Romberg testing[3] was also "negative." (Tr. 352).

On June 8, 2006, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "essentially mild degenerative disc disease without significant canal stenosis, disc herniation or foraminal encroachment." (Tr. 322).

On June 13, 2006, Plaintiff participated in an electromyography and nerve conduction study conducted by Dr. Gatti. (Tr. 349-50). The results of this study were "normal" with "no electrophysiological evidence of a mononeuropathy, radiculopathy, brachial plexopathy, peripheral neuropathy, or myopathy." (Tr. 350).

On June 16, 2006, Ronald Marshall completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 333-46). Determining that Plaintiff suffered from depression, Marshall concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (affective disorders) of the Listing of Impairments. (Tr. 334-42). Marshall determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular listing. (Tr. 343). Specifically, Marshall concluded that Plaintiff experienced mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and never experienced episodes of decompensation. (Tr. 343).

On June 20, 2006, Plaintiff was again examined by Dr. Gatti. (Tr. 347-48). The results of a physical examination were unremarkable. (Tr. 347). Plaintiff exhibited "normal" muscle tone with no evidence of atrophy. (Tr. 347). Plaintiff exhibited 5/5 strength "in all limbs" and there was no evidence of sensory deficit. (Tr. 347). Plaintiff exhibited no gait-related difficulties and

---

[3] Romberg test is a neurological test designed to detect poor balance. *See* Romberg Test, available at http://www.mult-sclerosis.org/RombergTest.html (last visited on September 22, 2011). The patient stands with her feet together and eyes closed. The examiner will then push her slightly to determine whether she is able to compensate and regain her posture. *Id.*

Romberg testing was negative. (Tr. 347). Dr. Gatti concluded, "I cannot find an explanation for" Plaintiff's alleged symptoms. (Tr. 347).

Treatment notes from the Harbor Arthritis Center, dated July 12, 2006, indicate that Plaintiff was experiencing "lupus syndrome with urticarial vasculitis, low-grade activity today" and "fibromyalgia with multiple tender points." (Tr. 416). It was further noted that Plaintiff continues to smoke and "has not had a follow up sleep study with Dr. Griffin as recommended." (Tr. 416). Plaintiff was again advised to stop smoking and engage in "daily aerobic exercise." (Tr. 416-17).

On November 10, 2006, Dr. Changxin Li completed a questionnaire provided to him by Plaintiff's counsel concerning Plaintiff's functional limitations. (Tr. 430-37). The doctor reported that during an 8-hour workday, Plaintiff can sit for less than one hour and can stand/walk for less than one hour. (Tr. 432). The doctor also reported that Plaintiff required a sit/stand option. (Tr. 432-33). The doctor reported that Plaintiff can frequently lift/carry five pounds and can occasionally lift/carry 10 pounds, but can never lift or carry more than 10 pounds. (Tr. 433). The doctor reported that Plaintiff "constantly" experienced "pain, fatigue or other symptoms severe enough to interfere with [her] attention and concentration." (Tr. 435). The doctor reported that Plaintiff was "capable of low stress" work. (Tr. 436). Dr. Li also noted, however, that this "questionnaire is completed with patient's reporting." (Tr. 436).

On December 8, 2006, Nurse Practitioner Jane Denay completed a questionnaire provided to her from Plaintiff's counsel regarding Plaintiff's functional limitations. (Tr. 445-50). The nurse reported that during an 8-hour day, Plaintiff can stand/walk for one hour. (Tr. 448). The nurse failed to indicate Plaintiff's capacity to sit during the workday, but did report that Plaintiff required a sit/stand option. (Tr. 448). The nurse reported that Plaintiff can frequently lift/carry 10

pounds, can occasionally lift/carry 20 pounds, but can never lift or carry more than 20 pounds. (Tr. 448). The nurse reported that Plaintiff was "capable of low stress jobs." (Tr. 448). With respect to the question "Is your patient a malingerer?," Denay did not answer "yes" or "no," but instead reported that Plaintiff "has not quit smoking or begun exercising as recommended." (Tr. 447).

Treatment notes from the Harbor Arthritis Center, dated August 8, 2007, indicate that Plaintiff was again instructed to stop smoking and was further "advised to initiate graded and progressive exercise program." (Tr. 487).

On September 7, 2007, Dr. Li completed another questionnaire provided to him by Plaintiff's counsel regarding Plaintiff's limitations. (Tr. 453-60). The doctor reported that during an 8-hour day, Plaintiff can sit and stand/walk for less than one hour each. (Tr. 455). The doctor also reported that Plaintiff required a sit/stand option. (Tr. 455-56). The doctor reported that Plaintiff can frequently lift/carry five pounds, can occasionally lift/carry 10 pounds, but can never lift or carry more than 10 pounds. (Tr. 456). The doctor reported that Plaintiff "constantly" experienced "pain, fatigue or other symptoms severe enough to interfere with [her] attention and concentration." (Tr. 458). The doctor concluded that Plaintiff was "capable of low stress" work. (Tr. 458).

On October 4, 2007, Nurse Denay completed another questionnaire regarding Plaintiff's limitations. (Tr. 462-67). The conclusions articulated in this report were identical to those she expressed on December 8, 2006. (Tr. 445-50, 462-67). With respect to the question "Is your patient a malingerer?," Denay again did not answer "yes" or "no," but instead reported that Plaintiff is "non compliant [with] suggestions re smoking/exercise to date." (Tr. 464).

On October 8, 2007, Plaintiff participated in a pulmonary function test the results of

8

which revealed "moderate to severe obstructive ventilatory limitation with high airway resistance." (Tr. 471-72). The doctor further observed, however, that "reversibility, or positive response to bronchial dilator Albuterol was demonstrated." (Tr. 472).

Treatment notes from the Harbor Arthritis Center, dated December 12, 2007, indicate that Plaintiff was experiencing "lupus syndrome with urticarial vasculitis, clinically stable." (Tr. 559). Plaintiff's medications were continued and she was "counseled on lifestyle changes including smok[ing] cessation, weight loss and exercise." (Tr. 559).

On May 13, 2008, Plaintiff participated in an echocardiogram examination, the results of which revealed "no significant major abnormality." (Tr. 572-73).

## **ANALYSIS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from: (1) degenerative disc disease of the lumbar spine with left leg radiculopathy; (2) degenerative disc disease of the cervical spine; (3) lupus/fibromyalgia; (4) digital ischemia involving the toes of the right lower extremity; (5) chronic obstructive pulmonary disease; and (6) obesity, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 14-18). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 18-23). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating

disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform light work[5] subject to the following limitations: (1) she can lift/carry 20 pounds occasionally and 10 pounds frequently; (2) during an 8-hour workday she can sit for six hours and stand and/or walk for two hours; (3) she must have a sit/stand option every 15 minutes; (4) she can never climb ladders, ropes, and scaffolds; (5) she can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (6) she can frequently reach and perform bilateral fingering, handling, and feeling; (7) she must avoid extremes of temperature and humidity; and (8) she must avoid concentrated exposure to pulmonary irritants. (Tr. 18). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant

---

[5] Light work involves lifting "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. Furthermore, work is considered "light" when it involves "a good deal of walking or standing," defined as "approximately 6 hours of an 8-hour workday." 20 C.F.R. § 404.1567; Titles II and XVI: Determining Capability to do Other Work - the Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251 at *6 (S.S.A., 1983); *Van Winkle v. Commissioner of Social Security*, 29 Fed. Appx. 353, 357 (6th Cir., Feb. 6, 2002).

can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 14,500 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 60-62). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).

      a.      The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts that the ALJ failed to properly assess the opinions of Nurse Denay and Dr. Li. The ALJ's assessment of each care provider's opinions is discussed separately below.

      1.      Dr. Li

As discussed above, on November 10, 2006, Dr. Li reported that during an 8-hour workday, Plaintiff can sit for less than one hour and can stand/walk for less than one hour. The doctor reported that Plaintiff required a sit/stand option. Dr. Li reported that Plaintiff can frequently lift/carry five pounds and can occasionally lift/carry 10 pounds, but can never lift or carry more than 10 pounds. The doctor also reported that Plaintiff "constantly" experienced "pain, fatigue or other symptoms severe enough to interfere with [her] attention and concentration" and, therefore, was only

capable of performing low stress work. Dr. Li also noted, however, that this "questionnaire is completed with patient's reporting." Dr. Li reiterated these conclusions in a September 7, 2007 report. Also, on December 9, 2007 and again on June 23, 2008, Dr. Li reported that Plaintiff was unable to perform a "normal job" due to her complaints of "breathing difficulties." (Tr. 474, 583). Plaintiff argues that because Dr. Li was her treating physician, the ALJ was obligated to afford controlling weight to his opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

As the ALJ recognized, the medical evidence (including Dr. Li's contemporaneous treatment notes) simply does not support the extreme limitations articulated by Dr. Li. Moreover, as Dr. Li indicated, his opinions were based, at least in part, on Plaintiff's subjective allegations which likewise enjoy little support in the record. As the ALJ also observed, Plaintiff has a history of non-compliance with her care providers' treatment directives, which caused Nurse Denay to refuse to rule out that Plaintiff was malingering. Accordingly, the ALJ discounted Dr. Li's opinions, concluding:

> The undersigned assigns scant weight to Dr. Li's residual functional capacity assessments. . .as his treating medical records. . .do not reveal findings. . .to support the severe limitations. The doctor has documented that the claimant has normal gait and station and has provided no other significant back or persistent extremity findings. The doctor has recorded only occasional respiratory difficulties, and the chest x-rays and pulmonary function studies do not reveal findings consistent with the doctor's respiratory restrictions. His progress notes do not outline severe psychiatric clinical signs or

14

>findings. Dr. Li's opinions. . .are found to be widely inconsistent
>with his own treatment records and therefore neither controlling nor
>deemed significant.

(Tr. 21).

For the reasons discussed above, the Court finds that there exists substantial evidence supporting the ALJ's decision to afford less than controlling weight to Dr. Li's opinion.

### 2.      Nurse Denay

As noted above, on December 8, 2006, Nurse Practitioner Jane Denay reported that during an 8-hour day, Plaintiff can stand/walk for one hour and required a sit/stand option. The nurse reported that Plaintiff can frequently lift/carry 10 pounds, can occasionally lift/carry 20 pounds, but can never lift or carry more than 20 pounds. The nurse also reported that Plaintiff was "capable of low stress jobs." Denay also refused to rule out that Plaintiff was malingering, noting that she had failed to comply with instructions to stop smoking and begin exercising. On October 4, 2007, Nurse Denay completed another questionnaire regarding Plaintiff's limitations. The conclusions articulated in this report were identical to those she expressed on December 8, 2006, including Denay's refusal to rule out that Plaintiff was malingering. Plaintiff asserts that the ALJ violated the "treating physician doctrine" by failing to afford controlling weight to Nurse Denay's opinions.

As the ALJ recognized, however, Nurse Denay is not considered an acceptable source of "medical" evidence whose opinion is entitled to any deference. 20 C.F.R. §§ 404.1513, 416.913 (recognizing that nurses are not considered "acceptable medical sources"). Plaintiff attempts to avoid this conclusion by arguing that one of the questionnaires at issue was, in fact, signed by Dr. Charles Huebner, an acceptable medical source whose opinion would be entitled to deference as

discussed above. The Court is not persuaded.

Plaintiff concedes that Nurse Denay signed the December 8, 2006 questionnaire, but asserts that Dr. Huebner signed the October 4, 2007 questionnaire. The ALJ found that Nurse Denay signed both questionnaires. (Tr. 20). In the Court's estimation, the two signatures appear sufficiently similar (and the content of the two questionnaires are sufficiently similar) as to constitute substantial evidence supporting the ALJ's finding on this issue. Plaintiff submits no evidence in support of her position that Dr. Huebner signed the latter questionnaire, but instead invites this Court to conduct its own independent handwriting analysis. The Court's authority in this matter extends only to reviewing the Commissioner's decision and determining whether such is supported by substantial evidence. This Court is not permitted to conduct the type of fact-finding Plaintiff urges. Furthermore, even if the Court assumes that the latter questionnaire was signed by a medical doctor the result is the same. As the ALJ observed, the opinions in question are contradicted by substantial evidence in the record. Moreover, as the author of this questionnaire observed, Plaintiff has failed to comply with her care providers' treatment directives calling into question whether she is malingering. Accordingly, Plaintiff's argument is rejected.

      b.     The ALJ Properly Relied on the Vocational Expert's Testimony

Pursuant to Social Security Ruling 00-4p, if a vocational expert offers testimony that conflicts with information contained with the Dictionary of Occupational Titles (DOT), the ALJ "must resolve this conflict before relying on the [vocational expert's testimony] to support a determination or decision that the individual is or is not disabled." Social Security Ruling 00-4p: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and other Reliable

Occupational Information in Disability Decisions, 2000 WL 1898704 at *4 (S.S.A., Dec. 4, 2000). Plaintiff asserts that the ALJ failed to comply with this requirement thus rendering improper and insufficient his reliance on the vocational expert's testimony.

With respect to whether there exists any conflict between the vocational expert's testimony and the DOT, the ALJ concluded: "[p]ursuant to SSR 00-4p, the undersigned observes that except for jobs with a sit-stand option, the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles*." (Tr. 23). As courts recognize, "[b]ecause the DOT does not address the subject of sit/stand options," testimony from a vocational expert that there exist jobs which a claimant, subject to a sit/stand limitation, can perform is not in conflict with the DOT. *See Zblewski v. Astrue*, 392 Fed. Appx. 488, 494 (7th Cir., Dec. 15, 2008). As the vocational expert's testimony in this matter did not conflict with the DOT, the ALJ was under no obligation to question the vocational expert about the matter.

Moreover, as courts also recognize, Plaintiff had an affirmative obligation to question the vocational expert if she believed that there existed a conflict between his testimony and the DOT. *See Beinlich v. Commissioner of Social Security*, 345 Fed. Appx. 163, (6th Cir., Sept. 9, 2009) (where plaintiff "had the opportunity to cross-examine the [vocational expert] and bring out any conflicts with the DOT. . .[t]he fact that plaintiff's counsel did not do so is not grounds for relief"); *Ledford v. Astrue*, 311 Fed. Appx. 746, 757 (6th Cir., Dec. 19, 2008) (where claimant "did not bring to the attention of the [ALJ] the alleged conflict between the oral testimony and the job descriptions in the [DOT]," the court observed that "nothing in applicable Social Security regulations requires the [ALJ] to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the

[ALJ]"). In sum, therefore, the Court discerns no error in the ALJ's questioning of the vocational expert or in his reliance on the vocational expert's testimony.

Plaintiff also asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996). The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 14,500 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon his response thereto.

## CONCLUSION

For the reasons articulated herein, the Court concludes that the ALJ's decision is supported by substantial evidence. Accordingly, the Commissioner's decision is **affirmed**. A judgment consistent with this opinion will enter.


Date:  September 30, 2011                        /s/ Ellen S. Carmody
                                                 ELLEN S. CARMODY
                                                 United States Magistrate Judge